**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| FRANKLIN CASH REGISTER, INC. | ) | |
| d/b/a GOOD AS NEW ELECTRONICS, | ) | |
| | ) | |
| *Plaintiff*, | ) | No.  20 C 6258 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| AMAZING DEALZZ, et al. | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises from a dispute between two sellers of refurbished vacuums on Amazon. Franklin Cash Register, Inc. filed this lawsuit, alleging that its competitor Amazing Dealzzz committed fraud, tortiously interfered with Franklin Cash's sales, contract, and business relationship with Amazon, and filed false complaints about its products. The case proceeded to a two-day bench trial in October 2023, where the Court heard testimony from the parties' owners. (Dkts. 81, 82). This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court makes these findings based on the parties' submissions, documentary evidence, and testimony at trial. As noted, the Court's credibility determinations are included when necessary. Unfortunately, Plaintiff provided little help at trial in presenting sufficient admissible evidence to prove by a preponderance of the evidence any of the charges. In fact, the trial comprised two business owners arguing over what they believed to be how they were wronged without little or no evidence for the Court to decide who was right. In

light of the Court's factual findings and conclusions of law, the Court finds in favor of Amazing Dealzzz and denies the injunctive relief and sanctions sought by the Plaintiff.

## **FINDINGS OF FACT**

Franklin Cash Register, Inc.[1], owned by Anthony Gonka, and Amazing Dealzzz, co-owned by Sharone Yerushalmi, resell SharkNinja vacuums through Amazon. (Dkt. 81 at 14:23, 28:3–4, 140:10–11, 143:9–10). Both companies purchase refurbished SharkNinja vacuums from a third-party company called Sohnen. (*Id.* at 18:24–25). Sohnen is a contract refurbisher and return center for SharkNinja products and accounts for numerous refurbished SharkNinja vacuums in the marketplace. (*Id.* at 28:2–4, 89:15–25).

Retailers return SharkNinja products to Sohnen who then resells them to companies like Franklin Cash and Amazing Dealzzz. (*Id.* at 28:4–12). Sohnen receives thousands of returns that are refurbished and then pushed into the marketplace, with Amazon being a major resale venue. (*Id.* at 28:13–18). To facilitate categorizing and reselling its inventory, Sohnen designates their refurbished products according to an assigned Amazon Standard Identification Number ("ASIN"), a unique identification number assigned to a specific product. (*Id.* at 28:20–21, 30:1–4). Then, through a committed model program, Sohnen requires a reseller, like the parties in this case, to purchase the entire supply of a certain model. (*Id.* at 28:21–24, 29:23–25). For example, if Company 1 wants to resell refurbished SharkNinja Model A vacuum on Amazon, that company must buy every single Model A vacuum that Sohnen has and will have.

This committed model program existed for several years as an ongoing business practice between Sohnen and its resellers, although the parties disagree on when this practice started— Franklin Cash says the practice was there from the beginning, but Amazing Dealzzz stated that it

---

[1] Franklin Cash Register operates a storefront called Good As New Products. (Dkt. 81 at 14:23–25).

started in 2019. (*Id.* at 172:5–10, 177:20–178:4). But the practice was never memorialized in writing until recently around 2021. (*Id.* at 87:4–9, 113:6–22, 191:10–16).

After purchasing the refurbished vacuums from Sohnen, the parties participate in Amazon's Certified Refurbished Program, also known as Amazon Renewed. (*Id.* at 33:17, 35:4–6). Amazon would create two ASINs for the same product—one new and the other refurbished. (*Id.* 35:25–36:3). When a consumer views the Amazon page of a new SharkNinja Model A vacuum, there is a link to the refurbished model page, stating that the consumer can save money by purchasing a refurbished model. (*Id.* at 36:3–11). By clicking that link, the consumer will be taken to the refurbished model page. (*Id.* at 36:8–11). On the refurbished model page, consumers can further click and view variations of the refurbished model, like different colors. (*Id.* at 38:24–39:10).

If the refurbished link is incorrect for any reason (either wrong model number, picture, or color), a reseller can submit a case to Amazon, with proof from the manufacturer's website, asking them to edit the link to direct the customer to the correct refurbished model. (*Id.* at 36:17–21, 148:19–23). Then, either a computer algorithm or an Amazon employee would review the proposed edits. (*Id.* at 36:18–19). Any changes to the refurbished link or listing must be approved by Amazon or the brand owner, in this case SharkNinja. (*Id.* at 149:4–22).

Here, Franklin Cash discovered that someone was submitting information to Amazon to change the refurbished links on the new SharkNinja models from Franklin Cash's products to Amazing Dealzzz's products. (*Id.* at 37:3–8). The submitted information included changing the model number and picture of the refurbished products. (*Id.* at 38:10–12). Every time Franklin Cash discovered that someone was rerouting its listings, it was forced to deactivate its listings to change back the information. (*Id.* at 37:21–24).

At the bench trial, when asked who the culprit was, Gonka replied Amazing Dealzzz, stating that "[t]hey would be the only ones that benefit off of it." (*Id.* at 90:7). From Franklin Cash's perspective, Amazing Dealzzz was claiming to Amazon that it had certain SharkNinja refurbished models when Amazing Dealzzz could not possibly have those models because Franklin Cash purchased all of them under Sohnen's committed model program. (*Id.* at 43:4–16). Instead, Franklin Cash states that Amazing Dealzzz was selling either cheaper models of the listed refurbished vacuums or different models entirely. (*Id.* at 39:10–15, 52:7–19). The Amazing Dealzzz's listings were also at a lower price point, thus forcing Franklin Cash to lower their prices to remain competitive. (*Id.* at 51:11–23). Franklin Cash complained about this conduct to Amazon, which did nothing. (*Id.* at 44:2–9). Yerushalmi testified that he never requested Amazon to change links or redirect traffic away from Franklin Cash's products. (*Id.* at 148:12–16, 183:23–184:3; 195:20–196:4).

To further investigate, Gonka made eight test purchases from Amazing Dealzzz, where the products were either fulfilled by Amazing Dealzzz or an Amazon warehouse. (*Id.* at 44:19–22, 64:5–7). According to Gonka, seven of the eight purchases were the wrong models from what Gonka had ordered. (*Id.* 44:23–45:3). Gonka could tell the models were wrong without opening the boxes because the model numbers labeled on the outside of the boxes were different from the ones on the Amazon listings. (*Id.* at 45:2–21).

Gonka proceeded to return the wrong models and made complaints on Amazon through his seller account that Amazing Dealzzz was selling incorrect products. (*Id.* at 46:2–7, 78:9–18). In response to Gonka's test buys, Amazon began shutting down Amazing Dealzzz's listings. (*Id.* at 143:21–144:2). Amazing Dealzzz submitted appeals to Amazon to reopen their listings, which involved checking the listings and submitting invoices to confirm that they have the listed

4

refurbished products. (*Id.* at 145:24–146:1). Amazing Dealzzz also sent an email, dated June 29, 2020, to Amazon stating that their account was being targeted by a competitor. (Dkt. 79-1 at 407; Dkt. 81 at 105:23–25). They said that in the past few months, Franklin Cash had purchased seven different products from Amazing Dealzzz and each time, they were returned broken or damaged, and Franklin Cash filed a report to shut down Amazing Dealzzz's listings. (Dkt. 81 at 105:25–106:2). In the email, Amazing Dealzzz stated that they do not wish to have Franklin Cash's account suspended or shut down, but only to have Franklin Cash stop buying and returning Amazing Dealzzz's products. (*Id.* at 106:11–14). Aside from this email, Yerushalmi testified that he never left any negative feedback or any other complaint about Franklin Cash. (*Id.* at 147:23–25). And throughout his time conducting business on Amazon, Yerushalmi testified that Amazing Dealzzz never intentionally sold any products that did not match their listings on Amazon. (*Id.* at 194:16–195:1).

At some point after the June 29 email, Amazon pulled down Franklin Cash's listings because it was accused of selling counterfeit products. (*Id.* at 50:19–22, 81:18–23). When asked who made the accusation, Gonka replied Amazing Dealzzz because "[t]hey're the only ones that would have benefited off of making those claims." (*Id.* at 51:5–10). The pulled-down listings were the same ones shared by Amazing Dealzzz. (*Id.* at 100:13–18).

## CONCLUSIONS OF LAW

The Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount-in-controversy exceeds $75,000. (Dkt. 41 at 1). The Court, sitting in diversity, will apply Illinois state law to Franklin Cash's claims. *See Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 927 (7th Cir. 2024).

Franklin Cash brings several state law claims: (1) defamation and defamation *per se*; (2)

5

tortious interference with prospective economic advantage; (3) tortious interference with contract and business relations; and (4) common law fraud. (Dkt. 41 at 12–16). It further seeks injunctive relief against Amazing Dealzzz. (*Id.*) In damages, Franklin Cash seeks $880,398.40, which includes actual and punitive damages and a sanction for attorneys' fees. (Dkt. 85).

In ordinary civil cases, the plaintiff must prove his claim by a preponderance of the evidence. *Avery v. State Farm Mutual Automobile Insurance Co.*, 835 N.E.2d 801, 856 (Ill. 2005); *see also Myers v. Levy*, 808 N.E.2d 1139, 1148 (Ill. App. Ct. 2004) ("The plaintiff need prove the common-law elements of defamation only by a preponderance of the evidence…"); *Christi Turpin v. Board of Trustees of Southern Illinois University*, 65 Ill. Ct. Cl. 189, 196–97 (Ill. Cir. Ct. 2013) (stating that a claimant must prove each element of tortious interference with business expectancy by a preponderance of the evidence). Under the preponderance-of-the-evidence standard, each element must be more probably true than not. *Avery*, 835 N.E.3d at 856. But in the context of common law fraud, the claimant must prove its elements by clear and convincing evidence, *id.*— a "quantum of proof that leaves no reasonable doubt in the mind of the fact finder," *Bazydlo v. Volant*, 647 N.E.2d 273, 276 (Ill. 1995). *See also Fox v. Heimann*, 872 N.E.2d 126, 133 (Ill. Ct. App. 2007) (noting that the plaintiff carries the burden of proving common law fraud by clear and convincing evidence).

## I.      Defamation and Defamation *Per Se*

As Franklin Cash's counsel noted in closing arguments, the defamation claim rests on Amazing Dealzzz's June 29, 2020 email to Amazon about Franklin Cash's test purchases. (Dkt. 82 at 221:25–222:1). To succeed, Franklin Cash must show that Amazing Dealzzz made a false statement about Franklin Cash, that statement was published to a third-party, and the publication caused damages. *Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 839 (Ill. 2006) (citation

omitted). A statement is defamatory *per se* if the statement's harm is "obvious and apparent on its face." *Id.* Under Illinois law, there are five categories of defamation *per se*: "(1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Id.* If a statement is defamatory *per se*, the plaintiff does not need to prove any actual damages. *Maag v. Illinois Coal. for Jobs, Growth & Prosperity*, 858 N.E.2d 967, 972 (Ill. App. Ct. 2006).

The sticking point in this defamation claim is that it fails at the first step—the Court does not find any evidence on the record to suggest that the June 29 email contained false statements. *See Andrews v. At World Properties*, 2023 WL 3939464, at * 4, n.4 (Ill. App. Ct. Jun. 12, 2023) (stating that truth is an absolute defense to defamation and defamation *per se*).

To start, the email states that Franklin Cash is targeting Amazing Dealzzz. (Dkt. 79-1 at 407). One definition of "target," as a verb, is to make "something or someone to be affected by an action or development." *Target*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/target#dictionary-entry-1 (last visited May 5, 2024). For all intents and purposes, Franklin Cash focused its attention and efforts at—in other words, targeted—Amazing Dealzzz when it purchased eight items from the company and returned seven. Thus, the Court does not find this assertion to be false. The email goes on to say that Franklin Cash purchased from and returned to Amazing Dealzzz seven products. That fact is not disputed.

It then states that Franklin Cash returned a broken, damaged product each time. It is difficult to determine whether this statement is true or false because there is no evidence of the

items' conditions on the record. Neither party testified about the subject. Gonka stated that he never opened the boxes to check their conditions. A natural reading of that line—"each time they have returned a broken, damaged product"—suggests that when Amazing Dealzzz received the returned items, they were broken and damaged. (Dkt. 79-1 at 407). There is no indication of who broke or damaged the items. Amazing Dealzzz was simply reporting its observations. Again, with only Amazing Dealzzz's word to rely upon, the Court also does not find that statement to be false.

The next assertion is that Franklin Cash filed a report to shut down Amazing Dealzzz's listings. Franklin Cash quibbles with this characterization, stating that they only sent complaints to Amazon. Under Illinois law, the defendant only must show "substantial truth" in his assertions, "which he can demonstrate by showing that the 'gist' or 'sting' of the defamatory material is true." *Myers*, 808 N.E.2d at 1152. First, Franklin Cash did file a report to complain about Amazing Dealzzz's alleged fraudulent behavior, hoping to prevent Amazing Dealzzz from selling incorrect items on their listings. (Dkt. 79-1 at 239; Dkt. 81 at 44:2–4). And second, Yerushalmi testified that Amazon was shutting down his listings for products connected to Gonka's repeated purchases-and-returns. (Dkt. 81 at 151:14–19). Amazing Dealzzz characterized those complaints as reports to shut down the listings because those complaints *did* shut down Amazing Dealzzz's listings. Thus, the gist of the alleged defamatory material is true.

## II.    Tortious Interference with Prospective Economic Advantage

Next, Franklin Cash alleges that Amazing Dealzzz tortiously interfered with Franklin Cash's prospective economic advantage. To succeed, Franklin Cash must prove: "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4)

8

damages to the plaintiff resulting from such interference." *Midwest REM Enterprises, Inc. v. Noonan*, 42 N.E.3d 46, 63, *as modified on denial of reh'g* (Ill. App. Ct. Nov. 10, 2015). But simply stating that there was interference is insufficient. Rather, "the element of purposeful or intentional interference refers to some impropriety committed by the defendant in interfering with the plaintiff's expectancy." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E.2d 981, 994 (Ill. App. Ct. 2008) (cleaned up).

Frankin Cash argues that Amazing Dealzzz improperly populated its Amazon product listings to match Franklin Cash's product listings even though Amazing Dealzzz could not possibly have those models. Therefore, Amazing Dealzzz interfered with Franklin Cash's expectation to enter into valid business relationships with its consumers. To prove its argument, Franklin Cash states that: (1) Gonka made eight test purchases, seven of which he believed were not the same models as the ones advertised on the Amazon listings;[2] and (2) Amazing Dealzzz could not possibly have the listed models because Sohnen's committed model program allotted those models to Franklin Cash.

To start, the Court doubts whether Franklin Cash has a reasonable expectation to enter into any business relationship at all. The first element for a tortious interference with prospective economic advantage claim requires "the plaintiff to *specifically* identify third parties who actually contemplated entering into a business relationship with him." *Intervisual Commc'ns, Inc. v. Volkert*, 975 F. Supp. 1092, 1103 (N.D. Ill. 1997) (cleaned up) (emphasis added); *see also Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, 2023 WL 5334638, at *34 (N.D. Ill. Aug. 18, 2023) ("To get past summary judgment, a plaintiff must identify a specific third party with whom the plaintiff

---

[2] During the bench trial, Franklin Cash's counsel produced photographs of the test purchases, but they were not disclosed during discovery and Amazing Dealzzz's counsel received them only at the beginning of trial. (Dkt. 81 at 60:1–5). Thus, the Court declines to consider them.

would have done business but for the defendant's interference."). If a plaintiff is not required to identify specific parties, then "liability under a theory of tortious interference with prospective business expectancies would be virtually without limit and impossible to calculate." *Celex Grp., Inc. v. Exec. Gallery, Inc.*, 877 F. Supp. 1114, 1126 n.19 (N.D. Ill. 1995).

Here, Franklin Cash never pointed to a specific third party who would have bought a refurbished vacuum from its listing over Amazing Dealzzz's. Rather, based on what little testimony was given, Franklin Cash only states that they lost customers to Amazing Dealzzz. Such an amorphous, vague description is insufficient to prove any reasonable expectation. *See, e.g.*, *Intervisual Commc'ns, Inc.*, 975 F. Supp. at 1103 (finding that plaintiff's tortious interference claim failed because it did not "specifically identify any particular third party with whom" defendant interfered). The Court is aware of decisions where the plaintiff only needs to state an identifiable class of third parties, and not their specific names, to establish some business expectancy. *See, e.g.*, *Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 37 (Ill. App. Ct. 1989); *Crinkley v. Dow Jones and Co.*, 385 N.E.2d 714, 720–21 (Ill. App. Ct. 1979) (finding plaintiff's description of third parties as "manufacturers of medical instrumentation or allied health care products or other products" sufficient). But those cases were decided at the pleading stage with a laxer standard. *Celex Grp.*, 877 F. Supp. at 1125. They hold no sway when ruling on a bench trial where its purpose is to assess the adequacy of the evidence. *Id.*; *Crinkley*, 385 N.E.2d at 722 (observing that the pleading requirement of alleging an "identifiable" rather than "identified" third party to establish business expectancy indicates that the third party's specific identity or name is revealed at a later time, like at trial).

Separately, the test purchases are not persuasive evidence that Amazing Dealzzz does not possess those models in its inventory. To begin, there is no preponderance of the evidence that Amazing Dealzzz shipped the wrong models because Gonka never opened the boxes to confirm. He only assumed that those seven test purchases were the wrong models because the model numbers labeled on the outside of the box did not match the ones from the listings. (Dkt. 81 at 115:25–116:3). He further attests that he ordered "tens of thousands of units from Sohnen" and the labels always matched the products within the box. (*Id.* at 116:13–14). But as a counter, the June 29 email to Amazon states that Amazing Dealzzz checked that their products matched the listings related to the test purchases and attached invoices and pictures for corroboration. (Dkt. 79-1 at 407; Dkt. 81 at 146:11–18). And Yerushalmi testified that Amazing Dealzzz previously sold the same models as the test purchases to other consumers and have not gotten any complaints. (Dkt. 81 at 146:22–147:6). So there is a possibility that the labeling could have been wrong or that Amazing Dealzzz's employees made a mistake or were incompetent, but in those cases, it does not prove that Amazing Dealzzz lied on their listings.

Moreover, testimony from both parties regarding Sohnen's committed model program raises more questions than answers about the program itself and how Sohnen operates. Gonka testified that the committed model practice existed from the very beginning of his relationship with Sohnen—starting off as an ongoing business practice and then later formalized in writing around 2021. (*Id.* at 113:1–25). Yerushalmi disagreed, stating some time in or before 2019, Sohnen operated as a free-for-all wholesaler, offering any and every model to resellers. (*Id.* at 177:13–18). Yet, the Court finds neither party credible because Gonka and Yerushalmi are not authorities on Sohnen operations. There was no witness from Sohnen to testify about how strictly this ongoing business practice was followed, what were the details and contours of the committed model

11

program, whether it applied uniformly across all resellers, or how and what models were separated into the committed model program or the general inventory system?

For example, there is no evidence of what volume of refurbished vacuums flowed through Sohnen. Gonka testified that the number was around 99%, but when asked how he arrived at the figure, he replied that Sohnen told him so. (*Id.* at 89:15–25). That is hearsay and thus, not admissible evidence. So the Court is left to assume that Sohnen handles a significant amount, but not all, of the refurbished products. So it is possible that, as Yerushalmi testified, a reseller can buy the same models of refurbished products that Sohnen possesses through other avenues. (*Id.* at 193:24–194:2). And so Amazing Dealzzz could have in stock the same models of refurbished vacuums that Franklin Cash has, just procured through another source. (*Id.* at 196:21–197:4). But this line of questioning was never explored in depth.

And throwing another wrench in Franklin Cash's way, Gonka confirmed that one of the test purchases he ordered matched the listing on Amazon. (*Id.* at 45:6–10). But according to Gonka's theory, such a match should be impossible under Sohnen's committed model program. As Franklin Cash's counsel stated in closing arguments, how Amazing Dealzzz managed to procure a correct model has not been established. (Dkt. 82 at 213:24–25). This inconclusive statement casts further doubt as to how large and accurate are Sohnen's operations. Assuming it was Sohnen's mistake, then how frequently is that mistake made? If Amazing Dealzzz acquired it from another source, then what refurbished models does Sohnen have exclusive possession for resale?

Again, for Franklin Cash to succeed here, it must prove an improper interference. But if Amazing Dealzzz could have acquired Franklin Cash's allotted refurbished models from another source, Amazing Dealzzz is not aware of what products Franklin Cash has an exclusivitiy

arrangement with Sohnen for, (Dkt. 81 at 197:2–4), and there is nothing preventing Amazing Dealzzz from then selling those models on Amazon, (*id.* at 196:21–197:1), then the Court does not see, by a preponderance of the evidence, that Amazing Dealzzz tortiously interfered.

In other words, the loud silence during the bench trial was an impartial, credible witness—unlike Gonka and Yerushalmi who both have an interest in how Sohnen employees operate and each gave their version to support their position; yet no independent witness from Sohnen ever testified about the procedure. The Court does not see a reason why one is more believable than the other to testify on whether it is possible for Amazing Dealzzz to get refurbished vacuum models that were allotted to another reseller. A Sohnen witness could have shored up some of these concerns.

### III. Tortious Interference with Contract and Business Relations

Franklin Cash also alleges that, in relation to Amazon, Amazing Dealzzz tortiously interfered with Franklin Cash's contract and business relations. To prove that claim, there must be (1) the existence of a valid business relationship or contract; (2) knowledge of the relationship or contract on the part of the interferer; (3) an intentional and malicious interference inducing or causing a breach or termination of the relationship or contract; and (4) resultant damage to the party whose relationship has been disrupted. *Ayo v. Quintero*, 2024 WL 1112937, at *4–5 (Ill. App. Ct. Mar. 13, 2024); *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 229 N.E.3d 869, 876 (Ill. App. Ct. Oct. 13, 2023) (referencing that the focus of the interference for tortious interference of prospective economic advantage is on the existence of a valid business relationship).

According to Franklin Cash, Amazing Dealzzz allegedly interfered in two ways: (1) submitting false information to Amazon to change the links for refurbished models so that a consumer will be redirected to Amazing Dealzzz's product instead of Franklin Cash's; and (2)

complaining to Amazon that Franklin Cash sold counterfeit products, causing Franklin Cash's account to be suspended.

Both allegations fail because Franklin Cash has not produced any evidence that, as a result of Amazing Dealzzz's alleged actions, its business relationship or contract with Amazon was terminated or breached. To succeed on a tortious interference with a contract, plaintiff must show that there was either "breach of contract, termination of the contractual relations, or rendering performance impossible." *Sols. Team, Inc. v. Oak St. Health, MSO, LLC,* 2018 WL 11432145, at \*12 n.7 (N.D. Ill. Mar. 5, 2018) (quoting *George A. Fuller Co., a Div. of Northrop Corp. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983)). The same principle applies to business relationships. *See D'Addario v. D'Addario*, 2022 WL 17974606, at \*11 (Ill. App. Ct. Dec. 28, 2023) (stating that the plaintiff must show that the defendant succeeded in ending the business relationship) (citing *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998))). As far as the Court is aware, Franklin Cash is still doing business with Amazon. And if there is a breach of contract, Franklin Cash has not submitted any contract as evidence or pointed to a particular breached clause. *See, e.g.*, *GTC Fin. Servs., Ltd. v. Asset Builders Assocs.*, LLC, 2014 WL 3610989, at \*6 (N.D. Ill. July 22, 2014) (noting "none of the particular acts stated allege that the defendants purposely caused a third person not to enter into or continue with prospective contractual relationship" (quoting *Parkway Bank & Trust Co. v. City of Darien*, 357 N.E.2d 211, 215 (Ill. App. Ct. 1976))); *Leonel & Noel Corp. v. Cent. Beer Imp. & Exp., Inc.*, 2012 WL 266370, at \*3 (N.D. Ill. Jan. 30, 2012) (noting that "a tortious interference claim requires a termination of the plaintiff's contract"); *Laser Indus., Ltd. v. Eder Instrument Co.*, 573 F. Supp. 987, 993 (N.D. Ill. 1983) (finding the tortious interference claim failed because there was no evidence of a termination of the contract, let alone the defendant intentionally inducing one).

Moreover, there is no persuasive evidence of interference by Amazing Dealzzz. When asked what evidence Gonka had for accusing Amazing Dealzzz of submitting false information to Amazon to change the links, he responded that "[t]hey would be the only ones that benefit off of it." (Dkt. 81 at 90:7). Irrespective of Gonka's credibility as a witness, that is not persuasive evidence. It is conjecture at best. Gonka presented one piece of circumstantial evidence that raises a slight suspicion of foul play, but suspicion alone is not sufficient for Plaintiff to meet his burden under the preponderance-of-the-evidence standard. Gonka points to a memo by Sohnen that reprimands bad actors who manipulate Amazon listings, but it does not reference Amazing Dealzzz. (*Id.* at 90:19–25). So there is no documentation from Amazing Dealzzz of its requested changes to Amazon links. There is no witness from Amazon to testify who requested what change. There are no computer records of the changes and the source of those changes. There is no direct or additional circumstantial evidence of any involvement by Amazing Dealzzz in submitting false information. In other words, it is speculation. The Court understands that Franklin Cash relies on Amazon for its livelihood and does not want to poke the bear by pressing Amazon for evidence.[3] But then, Franklin Cash must concede that without such information, it does not have a tortious interference case against Amazing Dealzzz.

Franklin Cash's second allegation fails for the same reason as stated above. Franklin Cash accuses Amazing Dealzzz of interference because Amazing Dealzzz allegedly complained to Amazon that Franklin Cash was selling counterfeit and incorrect products, leading to Amazon suspending its listings. (*Id.* at 50:19–22). When asked if he had ever seen a complaint made by Amazing Dealzzz about Franklin Cash's store other than the June 29 email—which does not reference Franklin Cash's selling practices—Gonka replied, "I don't have evidence that it was by

---

[3] Gonka testified that he issued a subpoena to Amazon for information on Amazing Dealzzz, but Amazon did not comply. (Dkt. 81 at 68:20–69:2).

[Amazing Dealzzz].” (*Id.* at 109:21–110:1). And when asked what evidence did Gonka have in asserting that Amazing Dealzzz complained to Amazon about Franklin Cash, he replied “[t]hat they were the only person that would have benefited from making the complaint.” (*Id.* at 110:9–12). So without anything more, this argument is also speculative and therefore, fails.

### IV.    Fraud

For Franklin Cash's common law fraud claim, he presents two different theories: as a result of Amazing Dealzzz's alleged fraudulent misrepresentations to Amazon, Franklin Cash has been injured as a competitor and a consumer. To prove common law fraud, there must be "(1) a false statement of material fact by the defendant, (2) who knew that the statement was false (3) and intended to induce the plaintiff to act in reliance upon the statement, (4) the plaintiff reasonably relied upon the truth of the statement, and (5) the plaintiff suffered damage as a result of action in reliance upon the statement." *Castlerigg Master Invs., Ltd. v. AbbVie, Inc.*, 191 N.E.3d 121, 126 (Ill. Ct. App. 2021). Franklin Cash must prove each element by clear and convincing evidence. *Avery*, 835 N.E.3d at 856.

Starting with the competitor theory, Franklin Cash argues that Amazing Dealzzz committed fraud by providing several false statements to Amazon, causing Amazon to change the refurbished links so consumers are directed to Amazing Dealzzz's products instead of Franklin Cash's and to shut down Franklin Cash's listings. This argument runs into several pitfalls. First, as discussed in the previous section, Franklin Cash has failed to present sufficient evidence for the Court to find that Amazing Dealzzz (1) submitted false information to Amazon to change any refurbished product links and (2) made any false complaints about Franklin Cash operating a counterfeiting business. To the extent that the fraud claim reaches the June 29 email, the Court already concluded that it did not contain any false statements.

But, assuming Amazing Dealzzz did knowingly make false statements, those misrepresentations were made to Amazon, who is not a party in this case. Common law fraud requires the defendant to make a false statement to the plaintiff who then reasonably relies on the truth of that misrepresentation to act. *See, e.g.*, Ill. Pattern Jury Instr.-Civ. § 800.01. Franklin Cash, not Amazon, is the plaintiff here. And there is no evidence that Amazing Dealzzz made any misrepresentations to Franklin Cash, who then reasonably relied on their truth and was induced to act in a certain way because of them. *See Vill. of Bensenville v. City of Chicago*, 906 N.E.2d 556, 591 (Ill. App. Ct. 2009) ("Plaintiffs allege no reliance of their own and so fail to plead common-law fraud under Illinois law."); *see also AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1041 (7th Cir. 1990) ("To be actionable, however, fraud must induce reliance—must in other words be both believed (if it is not believed, it can hardly be described as fraud) and acted on."). Rather, as vociferously argued at the bench trial, Franklin Cash believed those statements were false from the beginning and did not act at all in reliance. Thus, absent any evidence of actual reliance, Franklin Cash's fraud claim on this theory must fail. *See, e.g.*, *Premier Electrical Construction Co. v. Morse/Diesel, Inc.*, 628 N.E.2d 1090, 1099 (Ill. App. Ct. 1993) ("[A] common law fraud claim requires actual reliance which means that the misrepresentations must reach the plaintiff, who must reasonably rely on them").

Franklin Cash's next theory fares no better. It argues that Amazing Dealzzz committed fraud through a bait-and-switch—Amazing Dealzzz would allegedly purchase less expensive models of vacuums and then sell them on a more valuable Amazon listing. When consumers, like Gonka made his test purchases, bought a certain model on the valuable Amazon listing, the argument goes, they would instead receive a less valuable product in the mail. As discussed in the previous section, it is not entirely clear from the record that Amazing Dealzzz lied on its product

listings and knowingly sold the wrong models to consumers. But even assuming so, Franklin Cash again runs into the reliance obstacle. "In determining whether the injured party reasonably relied on the false statement, courts look to all relevant circumstances." *Chicago Export Packing Co. v. Teledyne Industries, Inc.,* 566 N.E.2d 326, 329 (Ill. App. Ct. 1990). At no point did Gonka rely on the truth of those alleged misrepresentations when he made his test purchases. Once Gonka realized that someone was redirecting consumers to Amazing Dealzzz's products instead of Franklin Cash's, he filed a complaint with Amazon. Gonka believed something was afoot because, pursuant to Sohnen's committed model program, those same models should be allotted to Franklin Cash. He made those test purchases for the sole purpose of proving that theory. Gonka was not acting as a regular consumer, who saw the listing and wholeheartedly believed in the truth behind the details when making the purchase. Rather, Gonka fully believed that the Amazon listing details should be wrong.

Thus, the Court finds that Franklin Cash has not met its burden of proving fraud by clear and convincing evidence.

## **CONCLUSION**

For the foregoing reasons, the Court finds that Franklin Cash has failed to meet its burden in its case against Amazing Dealzzz. Accordingly, Franklin Cash's requests for injunctive relief and sanctions are denied.

Virginia M. Kendall
United States District Judge

Date: May 8, 2024